In the Matter of the Application of THE LONG LAKE RAILROAD COMPANY for the Certificate Required by Section 59 of the Railroad Law.

*Railroad Commissioners — a certificate of public convenience, improperly denied because the railroad will enhance the value of lands likely to be bought for the State Park — because each of two connecting roads runs only ten miles and is incorporated by the same persons.*

The fact that the building of a railroad through a certain tract of the Adirondack wilderness will so enhance the value of lands in that locality as to increase the expense of their addition hereafter to the State Park, provided for by section 120 of chapter 332 of the Laws of 1893, is not a valid reason for the refusal of the Board of Railroad Commissioners of the State of New York to grant to a railroad company proposing to build such a railroad the certificate required by section 59 of the Railroad Law (Chap. 565 of the Laws of 1890, as amended by chap. 676 of the Laws of 1892).

If the convenience and necessity of the public in a certain locality require the road, the certificate should be granted, where no public interests are prejudiced.

It is not against the policy of the State to allow railroads to be built in the Adirondack forests, as is evidenced by the railroads already built therein, although it is its policy to procure title to and to preserve such forests and to prevent railroads being run through the State lands.

The mere fact that two railroads, professing to extend in opposite directions from the same point, each having a length of ten miles, are incorporated upon the same day and with the same directors, is not a sufficient ground for refusing the certificate of convenience and necessity, either because of the length of the roads, or because the two corporations may possibly charge extravagant rates; in the latter case, the statutes are sufficient to protect the public against extortion.

HERRICK and MERWIN, JJ., dissented.

APPLICATION by the Long Lake Railroad Company to the Appellate Division of the Supreme Court for the certificate required by section 59 of chapter 565 of the Laws of 1890, as amended by chapter 676 of the Laws of 1892, upon a certified copy of all maps and papers on file in the office of the Board of Railroad Commissioners of the State of New York in the matter of the application of said railroad company for such certificate, said board having, by an order made at the capitol in the city of Albany on the 11th day of November, 1895, denied the application of said railroad company for such certificate.

*John L. Henning*, for the Long Lake Railroad Company.

*Hamilton Harris*, for the New York Central and Hudson River Railroad Company.

*John P. Badger*, for Dodge, Meigs & Co.

*J. W. Houghton*, for George T. Underwood and Selia E. Marsh.

*D. G. Griffin*, for Sherman and others.

PARKER, P. J.:

The Long Lake Railroad Company filed its certificate of organization on April 17, 1895, and it proposes to build a railroad from Axton, in Franklin county, southerly along the Racquette river, a distance of about ten miles, to Long lake. It applied, under the provisions of section 59 of the Railroad Law, to the Board of

Railroad Commissioners for the certificate required by that section. The board refused to give the certificate, and, upon the maps and proceedings certified to this court, the company, under the provisions of such section, now asks from us an order directing that such certificate be issued. On the hearing before the commissioners the application was opposed by the New York Central and Hudson River Railroad Company; also by certain individuals organized for the purpose of protecting the State Forest Preserve. And such parties have also appeared by attorney and opposed the application now made to this court.

For the purposes of this case I will concede that the burden is upon the applicant to show us affirmatively that the Railroad Commissioners have erred in their refusal to grant the necessary certificate. And, further, I will concede that due weight should be given by us to that greater technical knowledge which they, rather than this court, are presumed to possess. And yet I cannot but think that in this case the board should have given the certificate desired.

Aside from the question whether the proposed road crossed lands owned by the State, there was but a single question presented to the board for its consideration. That was whether "public convenience and necessity require the construction of said railroad as proposed in said articles of association." As bearing upon that question, some facts appear in the case that are too plain for discussion. *First*, the entire community to be affected by the road is desirous that it be built. All seem to be of one accord that it would be a benefit to them, for no voice from that locality is raised against it. As bearing upon some objections that have been made to its construction, it is a significant fact that the Forest Commission, who have in charge the interest of the State in this domain, although notified of the hearing before the Railroad Commissioners, have no word to say against it. The principal objector is a railroad company which is at this very time operating a railroad through the very heart of the Adirondack forests. Next, it is apparent that there is no other road which can furnish the same advantages, or approximately the same advantages, to the community that this road would furnish. It competes with no other road, for there is none nearer to it than a distance of twenty-five miles through a wilderness, without highways, and through which there are no means of passing,

except by the natural streams and over difficult "carries." Into such a wilderness the road extends, and so desirous are the owners of the land over which it will pass, for its construction, that they stand ready to assist the company by donating to it the right of way.

It further appears that from Axton, the northern terminus of the road, the Racquette River Railroad Company is about to construct a road to Tupper lake, a distance of about ten miles, in a northwest- erly direction, where it will connect with both the Adirondack and St. Lawrence railroad and the Northern Adirondack railroad. A company has been organized to build that road, and a certificate of its necessity has been granted to the company by the Board of Rail- road Commissioners. Although it is intimated in the decision of the board that such road is not to be built, there is not a particle of evi- dence to that effect. For aught that appears, it is already in process of construction, and we should assume upon this hearing that it will be built as proposed in its articles of association.

Thus Axton, although but a hamlet, is a place of importance, inas- much as it is the point where communication to points outside of the Adirondack wilderness begins. From this point the road in ques- tion extends to the northeastern end of Long lake, whence steam- boat communication on that lake extends to the village of that name, and also the whole length of the lake, a distance of about twelve miles.

It is objected that the country through which this road passes is so sparsely settled and furnishes so little business that such a road is not necessary.

The evidence discloses that there are large lumber interests in that neighborhood; that on Long lake there are several hotels, much frequented in summer; that at Blue Mountain lake, about twelve miles further south, there are other hotels; and in fact that all the country in that vicinity is a favorite summer resort; that now all the supplies for those engaged in lumbering, and for the hundreds, if not thousands, of summer boarders and visitors in that locality are taken in some forty miles by wagon haul from North Creek, a place in the southeastern corner of the Adirondack domain, at an expense of seventy-five cents per 100 pounds. If this road is constructed, such freights will come in from the north to Long lake all the way

by rail, and can be distributed to Blue Mountain lake, Racquette lake, Indian lake and divers other points of summer resort in that locality, at a much shorter haul and much less expense. So, also, the hundreds of tourists, who in the summer visit that locality, will be equally and in the same manner accommodated. Those who locate on Long lake can go all the way by rail or steamboat. Those who locate on the lakes adjoining will have so much less transfer through the woods to endure. There is an immense water power close to the line of this road, and large tracts of lumber extend on either side of it and of Long lake. Clearly, the opening of such a locality to a market by rail is not only of immense advantage to such industries, but also the profits derived from that business are likely to prove a profitable source of income to the railroad company. Without going more into detail, it seems very clear to me that the interests of the public in that locality will be very greatly promoted by the construction of that road.

If the convenience and necessities of the public in *that locality* require the road, it plainly answers the requirements of the statute, unless some other public interests are prejudiced by it.

One of the objections urged against the road is that it proposes to cross lands belonging to the State. If this were so, I should consider it an insuperable objection. But, upon the evidence, it cannot be determined that such is the fact. The proof is by no means sufficient to enable us to adjudicate that the title to any part of the land over which the road passes is in the State, and, even if a doubt is raised upon that question, it would be unjust to deny this company the right to exercise their corporate franchises because of that doubt. Granting them the certificate they ask will not affect the title of the State, if it has any, nor prejudice its right to stop the construction of the road upon any land that belongs to it. And it is apparent from their decision that the Railroad Commissioners have not found such to be the fact, nor based their refusal on any such ground.

A further objection urged is that, by the building of the road, the lands in that locality will be greatly enhanced in value, and that it will, therefore, be more difficult and expensive for the State to purchase the same and add them to the "State Park," provided for by section 120 of chapter 332 of the Laws of 1893.

I have no doubt that public interests require the preservation of the forests in the Adirondack domain, and the benefit of the scheme on the part of the State to purchase and preserve them can hardly be overestimated. But I am not willing to adopt the theory that, in order to do so at the cheapest possible figure, the officers of the State are called upon, either by direct or indirect action, to use their official powers to depreciate the market value of such lands. Undoubtedly it is to be regretted that the State did not long ago purchase these lands, but inasmuch as it has not, and others have done so, it is not unreasonable that they should now desire to utilize their property for all that it is worth. They are asking no other or greater privileges for the benefit of their property than the State has freely granted to all other localities; and for the State to refuse them, simply because it wishes itself to acquire their property, is but a method of confiscating the property of a few for the benefit of the many, and is utterly at variance with the theory of our Constitution as well as with the first principles of justice. In my judgment, the idea that the State can purchase these lands cheaper if this railroad is not built, is an element that should have no control in the decision of the question now before us. But the concession that it would enhance the value of such lands is strong evidence of its public convenience and necessity.

It is further objected that it is against the policy of the State to allow railroads to be built into the Adirondack forests. It is the policy of the State to procure title to all the lands it can in that region; to preserve the forests thereon, and to prevent other parties from running roads through lands so acquired. Beyond that I do not discover any legislation indicating an intent to exclude that locality from the benefits of railroad communication with the rest of the State. Nor can I discover that the proper preservation of the forests in that domain requires the total exclusion of an additional line of railroad through it. There has recently been constructed one line which enters at its southwestern edge and extends through to the northeastern corner; also a line which extends from the northwest down to the center of that region at or near Tupper lake. Such roads have proved to be a great convenience, not only to those living in the localities where they run, but to thousands of other citizens, who annually seek that region for the benefits to their health,

or for the pleasure which it affords. The line of a railroad is such an insignificant strip through the immense area of forests that it practically detracts nothing from their beauty and is hardly an invasion of their solitude. These lines, however, add but little to the facility of access to the southeastern portion of the Adirondack region.

The line proposed stretches down into that section, and instead of extending too far, if it could be extended forty miles further to North Creek, and there connect with the railroad extending down the Hudson river, it would, in my judgment, be a great public convenience to hundreds of citizens who make their summer resort throughout the forests in that region.

I have carefully read the decision of the Board of Railroad Commissioners, and I am somewhat in doubt as to the real ground upon which they denied this application. Upon the only question before them, to wit, "Whether the public necessity and convenience required the road," they are quite indefinite. They say that the evidence upon that point is "far from strong," "is very slender," but they do *not* say that in their judgment "public necessity and convenience do not require the construction of the road." The consideration which really controlled their decision seems to have been that the articles of association for the Racquette River Railroad Company, above mentioned, were filed at the same time with those of this applicant, and that the directors of both companies are the same, but that this applicant did not apply for a certificate under section 59 until one had been granted to the other company. They say that had they known that it was the purpose to extend a railroad twenty miles instead of ten miles into this region they would not have granted the certificate to the Racquette River Company, and for this reason they deny the application of the second company. I gather from this that the real reason for denying this application is, not that it is unnecessary to the locality through which it extends, but that it penetrates too far into the forest, and is, therefore, not in harmony with "the general policy of the State as to the preservation of the Adirondack domain."

Concede.that that is a question to be considered by them, yet, as I have stated above, I cannot discover that the construction of a road twenty miles into this region would at all conflict with the general policy of the State. On the contrary, I think it would be

in entire harmony with its procedure in this respect. It has already allowed a railroad from the southwest to the northeast corner of that domain, and from the northwest down to Tupper lake, greatly to the advantage not only of the country itself, but also to that of very many citizens residing elsewhere; and it is but an invidious distinction to now deny equal facilities to those seeking to enter the southeastern portion of that domain. It is the destruction of the forest, and not facility of access to a few central points in that domain, that the policy of the State is seeking to prevent.

It is further objected that the promoters of this road are not acting in good faith, because they have organized two companies to build the road from Tupper lake to Long lake.

If they intend, by so doing, to charge extravagant rates, there are provisions of law which can control that; and that there are any other evils to be apprehended from the building of twenty miles of road by two companies, I am unable to discover. At all events, that fact is not at all controlling upon the question whether public convenience and necessity require the road.

None of the evils which the statute was designed to prevent are apparent in this case. There is no existing railroad company whose interests are to be unfairly affected by it, and no alluring but profitless investments are offered by it to the unwary citizen. It seems to be a plain case where the necessities and convenience of the public, in that locality, as well as those of a large number of citizens, who annually in the summer time seek access to that vicinity, require the construction of the road, and where no other public interests proper to be considered in connection with that question, will be prejudiced thereby. In my judgment, the Railroad Commissioners erred in not granting the certificate asked for, and an order should be made by this court requiring them to do so.

LANDON and PUTNAM, JJ., concurred; HERRICK and MERWIN, JJ., dissented.

HERRICK, J. (dissenting):

I regret that I am unable to concur in the opinion of Mr. Justice PARKER.

In determining appeals of this kind we have heretofore held that "We cannot consider the evidence as if we were determining the

matter in the first instance; some weight and importance must be attached to the decision of the Commissioners, and the burden is upon the relator to show to us that the decision of the Commissioners was contrary to the clear weight of evidence." (*People ex rel. Depew R. Co.* v. *Comrs.*, 4 App. Div. 259.) It has also been here-tofore said, " The Railroad Commissioners are vested with the supervision of the railroads of the State; it is made their special and peculiar duty to investigate and inform themselves as to the condition of existing roads, and as to the needs of the various parts of the State for transportation facilities; and their opinion upon these matters, in regard to which a proper discharge of their official duty requires them to be specially informed, is entitled to respect and consideration. * * * Their determination as to whether they will grant a certificate of public convenience and necessity is necessarily and properly largely a matter of discretion, not an arbitrary discretion, but a discretion enlightened and guided by their experience in the affairs of railroads, the problems of transportation, the needs of the people, together with the special facts brought before them in each particular case."

It has also been said that " unless the court can see that the decision of the Board of Railroad Commissioners was founded upon erroneous legal principles, or that it proceeded contrary to the clear weight of evidence in arriving at its conclusion upon any question of fact, or that it has abused the discretion vested in it, and has arbitrarily refused to issue the necessary certificate, I do not think that the court should reverse its determination and compel it to issue a certificate." (*Matter of Amsterdam, J. & G. R. R. Co.*, 86 Hun, 578.)

In this case it does not seem to me that the decision of the Railroad Commissioners, in refusing to issue the certificate applied for, was founded upon erroneous legal principles, or that the decision was contrary to the clear weight of evidence, or that the board has arbitrarily refused to issue the certificate.

The good faith of parties applying for certificates is always a matter that is entitled to weight in considering the application, and in this instance the Railroad Commissioners had a perfect right, among other things, to take into consideration the fact that the incorporators of the proposed Long Lake Company were also the

incorporators of the Racquette River Company; that the certificates of incorporation bear the same date, but that the certificate of the Long Lake Company was not filed until after the application was made and granted to the Racquette River Company, and its existence not disclosed to the Commissioners until after such certificate was granted. These facts the Commissioners say would have had some effect upon their action in the case of the Racquette River Company, had they been aware of them at that time.

It is obvious that by this method of proceeding a railroad may be continued on indefinitely section by section.

But, aside from those considerations, and treating the Long Lake Company as a separate and distinct company in all respects from the Racquette River Company, it does not appear to me that the refusal of the Railroad Commissioners to say that public necessity and convenience required the construction of this road was against the clear weight of evidence.

It is a matter of common knowledge, and is indicated by the evidence before us, that the lands in that part of the State, where it is contemplated to run this road, are owned in large tracts by the State, by lumber companies, speculators, and those desiring to establish private forest preserves. The country is sparsely settled, and practically the only industry is lumbering, the other pursuits being hunting and fishing, and the keeping of hotels and boarding houses for the accommodation of sportsmen and tourists.

Logging, or the transportation of logs from which lumber is to be made, is accomplished by floating them through the innumerable streams and small lakes distributed through this country, to the mills.

It is proposed to build this road from Axton to the outlet of Long lake, a distance of about ten miles. Axton, it appears from the evidence, is a lumber or logging camp, with a few huts or houses for the loggers or lumbermen; the name itself is significant. It does not appear whether it is inhabited all the year, or only during the logging season. At its proposed terminus at the outlet of Long lake there is no settlement whatever; the country through which it runs is wild forest land, and is all owned by a lumber company and by two private individuals; and I may say, in passing, that the fact that such persons are willing to give to the company the land

for its proposed route through their lands, lands which they have stripped of the larger portion of their value by cutting therefrom all the merchantable timber, does not strongly impress me as a reason why the certificate should be granted, nor does it indicate to my mind that there is any great public necessity for it, the land proposed to be given being of apparently little or no intrinsic value.

Long Lake village is some miles down the lake and is reached by what is known as a State road, and another road is in process of construction by the town. The means of reaching the village seem to be ample, except that such roads are not railroads. There are a few summer residences upon the shores of Long lake. It is proposed to reach Long Lake village from the terminus of the proposed railroad at the outlet of the lake by navigating the lake. At present the only navigation of the lake appears to be by rowboats, canoes and a single steam launch or tug. At times it is not navigable because of the logs in it, and it appears in the case that the launch or tug that navigates Long lake could not run at the time when the petitioners were being heard before the Commissioners in August, 1895, and had not been run that season, the lake being unnavigable by reason of the quantity of logs in it.

Of course this obstruction to navigation will disappear as the lumber in that region is exhausted, but so also will disappear one of the reasons given for the construction of this road, namely, the accommodation of the lumber trade.

It is needless to say that, for a great part of the year, navigation is suspended by reason of the lake being frozen.

The travel through this section, by which it is expected to support the road, is largely of tourists and lumbermen, and the freight business, that is expected to be obtained, is that derived from carrying supplies to the lumber camps, summer hotels and from the transportation of lumber.

Evidence was given before the Commissioners of an iron mine and also of a water power, from which it was argued that business might be derived in the future, and that the road would assist in developing both. The water power, it appears, is located some miles distant from the road, and has never been developed, but, it is asserted, could be used in the manufacture of lumber or of wood pulp.

The iron mine is also distant several miles from the road; it

appears that it had been worked many years ago, but abandoned because of the character of the ore.

The question as to whether a proposed road will be self-supporting is one proper to be considered upon its application for a certificate. It is difficult for me to see how a road commencing at a lumber camp and running through an unsettled wilderness to a point where there is not even a hamlet, the exit from and the access to which is closed up during a large portion of the year, which has no industries along its line and but a sparse population, can be made self-sustaining. The lumber interests spoken of and the business to be derived from the transportation of lumber and of lumbermen, and the carrying of freight to the lumber camps, is largely dwelt upon as one of the means of sustaining the road. Granting all that can be said in that respect, the fact still remains that that can be at best but a temporary source of business; it is part of the industrial and commercial history of the State that what is known as the Adirondack region has been largely stripped of merchantable timber, and what is left is rapidly disappearing, except that which is upon the forest preserve owned by the State and which cannot be parted with.

Indeed, it appears in the evidence in this case upon the part of the petitioners that the particular portion of this region over which it is proposed to run this road has been lumbered over and the soft timber taken off, and that there is now no lumber anywhere close by where the road is to be built " except, possibly, once in a while a hard wood tree."

The Adirondack wilderness has been the resort of tourists and a place for the location of summer camps and residences, very largely because it is a wilderness; and it is difficult to see how this class of travel and temporary residences will be increased by the construction of railroads which tend to destroy the qualities and characteristics of the place that make it attractive.

For the summer hotel keepers, the small merchants and the inhabitants of lumber camps it is very likely that the building of this road would be convenient, but there is not sufficient evidence to show that there is any public necessity that requires it or that there is sufficient business from the sources named to warrant us in believing that it would be a self-sustaining road.

In addition, it may be said that for some years it has been the policy of the State to preserve the Adirondack wilderness, and to restore it as far as possible to its former condition, and that anything which interferes with that policy should not be encouraged by any department of the government. The building of railroads, it seems to me, must materially interfere with that policy, and the fact that certificates have already been issued to some companies is no reason why the evil should be increased by granting them to others.

Without further discussion, suffice it to say that it does not appear to me that the decision of the Commissioners was against the clear weight of the evidence, and it should, therefore, be affirmed.

MERWIN, J., concurred.

Decision of Railroad Commissioners reversed, without costs, and the certificate ordered issued.